IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

ESTATES OF WILLIAM I. GRIFFITH and
RONALD MAYNOR,
and
MORELAND & MORELAND,
2518 Kanawha Blvd., Charleston, WV
and
UNITED MINE WORKERS OF AMERICA
INTERNATIONAL UNION,
18354 Quantico Gateway Drive, Triangle, VA

    Plaintiffs

v.

JOSEPH MAIN, Assistant Secretary
MINE SAFETY and HEALTH ADMINISTRATION
U.S. Department of Labor,
and
HILDA SOLIS, Secretary,
U.S. Department of Labor

    Defendants.

### *MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER and PRELIMINARY INJUNCTION*

  Comes now Plaintiffs Estates of William I. Griffith and Ronald Maynor and Moreland & Moreland and in support of its motion for Temporary Restraining Order and Preliminary Injunction state as follows:

### I. Facts and Legal Standard

  Plaintiffs adopt Plaintiff UMWA's statement of Facts and Legal Standard in their entirety as if fully set out herein and includes the affidavit of Mark D. Moreland attached hereto as Plaintiff's Exhibit A.

## II. Introduction

The evidence obtained in "preliminary" interviews goes to the core of resolution of factual questions about causation of the deaths of twenty-nine men. Defendants deny the largest stakeholders, the families of twenty-nine deceased miners, and hundreds of working miners timely access to critical information. As a result Plaintiffs will suffer irreperable harm absent injunctive relief.

## III. Argument

**A.  *MSHA must conduct a Public Hearing to adequately gather the facts because a public questioning forum would aid the accident investigation and would provide additional information and insights not available through other means of inquiry.***

The *Federal Mine Safety and Health Act, 30 U.S.C.A. § 813 (b)*, grants MSHA the authority to hold public hearings:

> For the purpose of making any investigation of any accident or other occurrence relating to health or safety in a coal or other mine, the Secretary may, after notice, hold public hearings, and may sign and issue subpoenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and administer oaths. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpoena served upon any person under this section, the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Secretary or to appear and produce documents before the Secretary, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

Plaintiff recognizes that the language of *§ 813* is permissive and not mandatory. Accordingly, MSHA has interpreted the statute as reflected in its publication of MSHA policy: *MSHA HANDBOOK SERIES, Handbook Number: PHOO-I-5, "Accident/Illness Investigations Procedures Accident/Illness Investigation Handbook"* (the "Handbook"). (Plaintiff's Exhibit B)

The Handbook provides criteria to identify those accidents "where a public questioning forum would aid the accident investigation or would provide additional information and insights not available through other means of inquiry." *Id. at Chapter 3, page 31.* MSHA's criteria include:

> a. Accident investigations of sufficient complexity, magnitude, or nature as to warrant appointment of a special accident investigation team by the Admininstrator with national office staff direct participation...
> d. Accidents of recurring nature where the causes have been difficult to ascertain...
> f. Where records and documents are needed to assist the accident investigation but will not be produced unless a subpeona is issued.

In the present case criteria (a) applies because the investigation includes a special accident investigation with national office staff direct participation. Criteria (d) exists in the form of 600 safety violations over a period of eighteen months. Fifty of those citations came in March alone. Many of those fifty citations were for poor ventilation of dust and methane, failure to maintain proper escape ways, and the accumulation of combustible materials. To date, MSHA has failed to ascertain the cause of these recurring violations.

As to criteria (f), although it is early in the investigation, current circumstances indicate that MSHA must issue subpeonas to obtain records and documents. After much prodding by miners' families, MSHA admitted that the investigative team determined that one page of a fire boss book has been removed. (*Exhibit A, MSHA Family Meeting, Liberty High School, May 5, 2010.*) This disturbing example of mutilation of documentary evidence compels the conclusion that in order to assure evidence is fully produced, and produced unaltered, MSHA must issue subpeonas.

On three occassions Plaintiff Moreland & Moreland, on behalf of the Estate of William I. Griffith, requested public hearings. Our first request was made on April 20, 2010. Renewed requests were made on April 23 and April 26, 2010 respectively. MSHA did not *even*

*acknowledege* that our request was received until April 30, 2010, 10 days after our original request. (See Plaintiff's Exhibit C) MSHA's response to our request came in the form of the current procedure as announced to all of the families on May 5, 2010, more than two weeks after our original request. (Plaintiff's Exhibit D, *MSHA news release 5/6/10: MSHA announces series of public meetings to bolster transparency in investigation of Upper Big Branch Mine explosion*.)

  The largest stakeholders, the families and working miners, have requested a public hearing, MSHA has directly spoken to this issue in its policy manual, the Handbook, and at least three of MSHA's criteria for establishing the appropriateness of a public hearing have been met. To properly refuse Plaintiffs' public hearing request MSHA must show that the Upper Big Branch disaster investigation does not merit a public hearing in accordance with its own policy goal as stated in the Handbook and the criteria enumerated therein. MSHA has failed to do so.

  The power of inquiry with the process to enforce is appropriate and essential to get to the truth of what caused the Upper Big Branch disaster. In order to conduct a thorough investigation MSHA must utilize its subpeona power. MSHA's executive power does not allow it to issue a subpeona in the absence of a public hearing. In other words, MSHA does not have the power to issue an *administrative* subpeona to assist in its investigation of the Upper Big Branch mine disaster. Accordingly, MSHA must exercise its *judicial* power via public hearing in order to utilize its subpeona power. As Plaintiff UMWA elucidates in its brief, without a subpeona witnesses may be uncooperative and incomplete in their response to questions. In the absence of subpeona when questions become difficult witnesses may refuse to answer the question or even end the interview.

  Under MSHA's announced procedure witnesses may be accompanied by "witness representatives". Historically, companies may manipulate the interview process by providing

witnesses with witness representatives, ostensibly free lawyers, at company expense. If MSHA continues its investigation as announced, Massey's lawyers will be the the white elephant in the room that impacts MSHA's questioning and the 800lb gorilla in the room[1] that witnesses cannot ignore. No matter how well meaning MSHA may be in its attempts to isolate Massey from early parts of the investigation, because of procedural requirements, MSHA cannot exclude Massey from interviews. The Plaintiff's shall suffer irreperable harm absent the relief requested. A public hearing would mitigate the company's influence, recognize the families right to timely information, and strike a fair balance between all stakeholders. In sum, MSHA must use its subpeona power to uncover the full truth.

**B.** *MSHA must conduct a Public Hearing and/or allow family and miners representatives to attend witness interviews to keep the miners' families informed and to legitimize its conclusions in the eyes of the public.*

According to its own policy directive, implementing Section 7 of the Miner Act, MSHA is to be "as responsive as possible to requests from the families of mine accident victims for information relating to mine accidents." In addition, in such accidents, MSHA must "serve as the primary communicator with the operator, miners' families, the press and the public." Plaintiff's Exhibit E. (See: http://www.msha.gov/REGS/COMPLIAN/PPLS/2009/PPL09-V-03.asp) More than a month after the disaster, the families of Upper Big Branch are being kept in the dark about MSHA's investigation. MSHA has failed to keep the families up to date about the status of the investigation. MSHA has failed to act with appropriate diligence to properly inform families

---

[1] An old riddle asks:
"Where does an 800 lb. gorilla sit?"
The answer:
"Anywhere it wants to."

about the investigation and/or its findings. MSHA has failed to fullfill the purpose of its own directives.

MSHA's chosen process is flawed and does not reach its goal of "putting families first." The families deserve consistent, accurate, and timely information. The Plaintiffs shall suffer irreperable harm if MSHA continues to subject families to continued confusion and an information vacumn. Families have endured trickle-down information, misinformation, and rumor since the tragedy occurred. MSHA's closed-door procedure does not indicate how families will be informed of findings as the investigation proceeds. MSHA does not provide a timetable of any kind for disclosure of information[2] to the families. Indeed, MSHA ranks the families in either third or fourth place to participate in the process, long after contractors and experts. After standing in line for an undertermined period of time, families may "express their thoughts about the explosion, the response, the investigation and potential reforms in mine safety and health laws." *See Plaintiff's Exhibit C.*

As Plaintiff UMWA explains, clouds of suspicion, in the form of an FBI investigation, hover over MSHA's operations and decisions. One question raised is whether MSHA can conduct an unbiased and independant investigation when the agency itself is under investigation. In the absence of a public hearing MSHA's analysis of its own role, if any, will remain unnecessarily secretive and inherently suspect. Under the current investigatory rubric, the state and federal government, privy to and sharing the same information, may come to separate conclusions. The entities may disagree about the ultimate cause of the accident and cast further shadow on the investigation. In that connection, another question raised is whether potential disagreement

---

[2] Transcripts of the interviews will not be released until after the investigation is complete. Moreover, transcripts may or may not be released depending upon whether a witness requests confidentiality.

between two governement agencies participating in a closed-door investigation would undercut prosecution of criminal offenses by the Department of Justice. The most practical way for MSHA to legitimize its findings and conclusions in the eyes of the public is to conduct a public hearing and/or allow miners representatives and family representatives to attend witness interviews.

As Ken Ward of the Charleston Gazette reports, Assistant Secretary Main, in the role of Director of Health and Safety for UMWA, summarized the importance of a comprehensive public process:

> Congress intended MSHA's investigations to constitute a public accounting, not a secretive process....
>
> To avoid the self-investigation dilemma and the appearance of cover-up, the Agency should provide for testimony from MSHA employees in a public setting. Miners and their representatives need to be involved in that process. Asking questions of all those involved in mine safety is essential to a comprehensive process.

*Plaintiff's Exhibit F.*
(See:*http://blogs.wvgazette.com/coaltattoo/2010/05/07/way-back-when-joe-main-thought-msha-should-hold-public-hearings-on-mine-disasters/)*

**C.** *Exclusion of family representatives and miners' representatives from witness interviews is contrary to the law, regulations, written policy, and past precedent of MSHA.*

> *1. MSHA's exlusion of miners' representatives from witness interviews, directly in contravention of MSHA policy, is an abuse of the agency's discretion.*

MSHA's investigation of mine accidents is authorized and governed by section 103 of the Mine Safety and Health Act of 1977 and implementing regulations.  <u>30 USC 813; Title 30, Code of Federal Regulations.</u>  Pursuant to that authority, MSHA has published its interpretation of the law's mandate to the agency and established policy and protocol for its conduct of such investigations.  *See MSHA HANDBOOK SERIES, Handbook Number: PHOO-I-5,*

"*Accident/Illness Investigations Procedures.*  (Attached as Exhibit B).

Page 25 of this manual of MSHA policy, while discussing the interview process, clearly indicates that "the representative of miners (if any) **will** (emphasis supplied) be invited to participate."  At page 26, the witness questioning process for miners representatives is spelled out with particularity.  This MSHA statement of its own policy reflects the historical fact that the interview process during an MSHA mine accident investigation is an integral part of the investigation which has routinely been open to attendance and participation by the duly nominated miners' representatives pursuant to 30 CFR 40.

In "unusual circumstances" MSHA's policy allows for the restriction of interview attendees to just MSHA and state agency representatives.  The manual lists five factors that could lead to such a restriction, none of which are present in this case.  Witness request for a private interview (none have yet been made),  misconduct by non-government particpants (none has been alleged), and factors which could interfere with MSHA carrying out its investigative responsibilities (no such factors have been credibly asserted as relates to miners' representatives in this case) are listed as factors which could lead to exclusion of the miners' representatives from the interview process.

*a. MSHA Attempts to Justify Its Actions*

MSHA Director Joe Main has made public statements regarding why MSHA seeks to exclude miners' representatives from the interview process.  Director Main, in an interview with West Virginia Public Radio broadcast on May 11, assigned two reasons: one, the concern of witness intimidation by the mine operator/undue influence by the mine operator in the interview process, and; two, a possibly active Justice Department investigation into possible criminal

violations associated with the mine accident.  Neither reason supports the agency's attempts to exclude family representatives and miners' representatives from the interview stage of MSHA's investigation.  Rather, Director Main's justifications support the conclusion that MSHA is abusing its discretion.

### b. Undue Influence by the Operator

As noted by the affidavit of counsel attached as Exhibit A, Director Main has publicly acknowledged that it is most likely that interviews conducted by MSHA will include attornies that are being compensated by the operator or one of its associated corporate entities.  While MSHA indicates that it intends to subject such attornies to "a strict ethical test," that test is no more than is required by the <u>Rules of Professional Conduct.</u>

Such ethical test would not preclude those attornies from conveying non attorney/client communications to the mine operator respecting the interview process, the investigation, or the likely path of the investigation.  Such ethical test also cannot invade the attorney/client privilege that exists between the attorney and the witness.  As a result, MSHA will not be privy to any agreements that the attorney and the witness have made as to the extent of information the attorney is authorized by the client to share with the operator.

MSHA's expressed "concern" regarding the operator's potential "intimidation/undue influence" has resulted in excluding miners representatives and family representatives from the interview process and knowledge about the process, but not preventing the operator from obtaining information about that process.  The procedure adopted does nothing to address the concern expressed; the procedure adopted is an abuse of the agency's discretion.

Additionally, MSHA has not articulated (and cannot) how exclusion of miners and family representatives from the interview process in any way addresses its concern that the operator will somehow have undue influence over the process. The miners representatives (UMWA, which has a long history of being in adverse actions with the operator, and Moreland & Moreland, a law firm which has routinely sued the operator and its afffiliated corporate entities in the past and has claims pending against the operator currently) or representatives of the families that "stand in the shoes" of deceased miners can not be realisticly viewed by any potential witness as being tied to the operator and therefor conveying any type of alleged intimidation on the operator's behalf. Again, the procedure adopted has no rational relationship to the concerns MSHA expresses. The procedure adopted is an abuse of discretion.

*c. The FBI Investigation*

Director Main, in the same interview with West Virginia Public Radio mentioned above, also acknowledged that MSHA has conducted accident investigations previously while the FBI is also conducting investigation into the same accident. There has been no indication by MSHA as to how it concludes that excluding representatives from the interview process in this investigation either furthers or hinders any FBI investigation. The procedure adopted does not address the concern expressed; it reflects an abuse of agency discretion.

As reflected in the Affidavit of Mark D. Moreland (Exhibit A), the existance of an FBI investigation at this time could actually be as a result of MSHA's own Section 110 investigation and a referral of information to the Justice Department (which could have occurred prior to or after the April 5 UBB explosion). MSHA should not be heard to ignore its own regulations due to an FBI investigation it placed in motion. Whether MSHA's Section 110 investigation has resulted

in the Justice Departments investigation regarding UBB or not, MSHA still has not articulated how its announced procedure for this investigation (excluding the families and miners representatives from the interview process while allowing the mine operator and its affiliated corporate entities [presumably the subject of any Justice Department investigation] information about the process) furthers or avoids hindering the FBI investigation.  The announced procedure does not address the concerns expressed; rather, it reflects an abuse of the agency's discretion.

*d. MSHA's "Justification" for Excluding Families and Miner Representatives Fails*

It is clear that MSHA cannot articulate any plausible state of facts for the adoption of its procedure in this investigation of excluding those individuals who are most affected by this tragedy from the investigative process while allowing the mine operator ongoing and current information from the interview process.  MSHA regulations set forth specific criteria for the "unusual circumstances" when miners representatives can be excluded from the interview process.  None of those criteria are present in this instance.  Stated differently, MSHA is proceeding in direct contravention of its own regulations and policy.  The process MSHA has adopted is an abuse of agency discretion.

An overview of past investigations instructs that family representatives and  miner representatives have been allowed to attend witness interviews. Importantly, miners' representatives were allowed to attend thirty plus witness interviews in the Kentucky Darby Disaster (Harlan County, KY: May 20, 2006). The MSHA investigation of a double fatality that occurred at Stillhouse Mining (Harlan County, KY: August 3, 2005)

allowed attendance of miners' representatives at witness interviews. The investigation of a single miner accident, David Morris Jr., Harlan County, KY: December 30, 2005, allowed the attendance of **both miners' representatives and family representatives** at witness interviews. Accordingly, following its own precedent and past procedure, MSHA should include miners' representatives and family representatives in witness interviews.

### IV. Conclusion

The Supreme Court's decision in *Winter v. Natural Resources Defense Counsel, Inc.* 129 S.Ct. 365 (2008) instructs that the Court must consider whether "irreparable injury is likely in the absence of an injunction," and must "'balance the competing claims of injury,'" Further, the Court must "'pay particular regard for the public consequences in employing the extraordinary remedy of injunction .'" *Id.* at 375-77.

In the present case, in light of *Winter,* the Court should order injunctive relief. Absent the relief requested Plaintiff's will suffer irreparable injury because the damage to Plaintiff, including MSHA's denial of timely access to critical information, cannot be measured by any pecuniary standard. As to the balance of the equities and competing claims of injury, MSHA is the only participant in this process resisting a public hearing. Indeed, an injunction is clearly in the public interest because all interests, private and public, have coalesced and called upon MSHA to conduct a public hearing. With regard to success on the merits, MSHA's policy directives and procedures counsel toward a public hearing and dictate that miners' and family representatives must be present for interviews. Plaintiffs have made at least a prima facia showing to a right for relief and success on the merits by virtue of MSHA's failure to follow its own policy directives

and Handbook criteria. The continuation of the investigation in the manner announced by MSHA amounts to a continuing and recurring violation of Plaintiffs' legal rights. Therefore, Plaintiffs respectfully request that this court issue a Temporary Restraining Order.

                                                                Respectfully Submitted,

      /S/ Rachel Moreland

Rachel Moreland, Esq. (WVSB #9767)

**MORELAND & MORELAND, l.c.**

117 E. Washington Street, Ste. 14

Lewisburg, WV 24901

P:(304)793-4529/F:(304)793-4530

rachel@morelandfirm.com

      /S/ Mark D. Moreland

Mark D. Moreland, Esq. (WVSB#4754)

**MORELAND & MORELAND, L.C.**

2518 Kanawha Blvd., E.

Charleston, WV 25311

(304) 344-5278 fax: (304) 344-5283

mark@morelandfirm.com