

EXHIBIT
A

# AFFIDAVIT OF MARK D. MORELAND, ESQ.

1.   My name is Mark D. Moreland. My law firm, Moreland & Moreland, l.c., represents two women who serve as the administratrixs of the estates of their husbands who were killed in the Upper Big Branch Mine (UBB) explosion on April 5, 2010. My partner, Rachel Hanna Moreland, and I have been actively involved in investigating, to the extent possible, the circumstances that existed at UBB prior to the explosion and the developments that have occurred since.

2.   We have attended two informational meetings (April 21, 2010 and May 5, 2010) where MSHA representatives met with the families of those miners who perished in the explosion, have conversed personally with MSHA Director Joe Main, MSHA Administrator Kevin Stricklin, and MSHA Investigation Leader Norman Page, and have discussed the explosion, the mine, the operator, and MSHA actions extensively with community residents.

Justice Department Investigation

3.   We have reviewed the extensive record of citations and orders issued by MSHA in relation to UBB prior to the explosion, interviewed miners who worked at UBB, and discussed facts and findings with experts in the mining field.

4.   We have complied with MSHA regulations to be appointed miners representatives pursuant to <u>30 CFR 40.1, et seq.</u> and continue to cooperate with MSHA officials in respect to verification requirements not contained in the regulations but currently imposed by MSHA regarding that designation.

5.   From our first conversations with MSHA officials (Mr. Strickland and Mr. Page) on April 21st, long before any news of an FBI investigation being conducted regarding UBB was made public, MSHA advised that it was considering and actively exploring mechanisms for excluding miners representatives from the witness interview process of the MSHA accident investigation. MSHA expressed concern that the direction of its investigation could be discerned by "others" if the

miner representatives were included in the interview process.

6. Multiple Orders issued by MSHA to the mine operator of UBB qualify for review in respect to the initiation of a Section 110 special investigation by MSHA. Such investigations may, under MSHA procedure, lead to a referral to the Justice Department and an FBI investigation. I have no direct knowledge that any special investigation by MSHA under Section 110 was initiated or considered either before or after the April 5 explosion at UBB, although I have indirect knowledge of at least two individuals who have indicated they have given statements to both FBI and MSHA investigators at a time prior to the MSHA accident investigation teams indication that it was to begin interviews.

7. It is my understanding that MSHA considers removal of any page from a "fire boss book" to be a willful/knowing violation and a potential criminal violation and MSHA advised at its May 5, 2010 that a page had been removed from one of the fire boss books at UBB. Such acts could likewise trigger a Section 110 investigation and/or an FBI investigation.

8. Prior to the May 5, 2010 MSHA meeting, my partner and I had a conversation with MSHA Director Joe Main during which I advised him that it was my understanding that it had been reported that "another federal agency" had conducted in excess of two dozen interviews in the community; Mr. Main responded that he was sure that they likely had conducted far more interviews than that by the time of our conversation.

9. Based upon all of the above, I find MSHA's assertion, made by Mr. Main at the May 5 meeting and in an interview with West Virginia Public Radio broadcast on May 11th, that it cannot confirm the existance or the possible purpose of an FBI investigation regarding UBB, difficult to credit.

10. Even if MSHA is unaware of the purpose of the apparent FBI investigation which includes interviews of persons who formerly worked at UBB, the existance of such an investigation gives no support to MSHA's attempts to exclude miners representatives from the interview process of its accident investigation regarding the UBB explosion.

## MSHA and the Families

11. MSHA has not followed the policies of MSHA and of the U.S. Department of Labor as announced to the families of the deceased miners. From the beginning of the first MSHA family meeting on April 21, MSHA advised the families, through Kevin Strickland, MSHA Administrator, that MSHA would provide all information regarding any developments in its investigation to the families first and before such information was released to the public or the press.

12. MSHA Director Joe Main, at the MSHA meeting on April 5, advised the families that both MSHA and the Department of Labor (through himself and Department of Labor Secretary Hilda Solis) efforts and actions were guided by "the interest of the miners first, and in the event the miner is no longer living, by the interest of the families."

13. Shortly after conveying the information in 12 above to the families, Director Main advised the families that they could have no representation in the investigation of the UBB accident, either at the interview of witnesses or during the inspection of the mine.

14. During the April 5 MSHA meeting MSHA advised the families that it would call the contact person for each family and inquire whether that person and/or other family members desired to meet privately with MSHA to convey information or knowledge they may have regarding UBB or the accident; to my knowledge, no such contacts have been made.

15. While family members attempted to discuss information regarding UBB with MSHA during the MSHA meetings (including, but not limited to, such meaningful information that the mine, or a portion thereof, was evacuated just days before the explosion due to the presence of excessive levels of methane without notification of MSHA by the mine operator), no apparent attempt was made by any MSHA personnel to elicit names or phone numbers of family members who were making such attempts and, to my knowledge, no MSHA personnel has followed up with any of the family members who indicated at the meetings that they had such information.

16. At the April 5th MSHA meeting, MSHA advised the families that it would again meet with the families before the mine was entered by MSHA for an

inspection as part of the investigation; MSHA also indicated that it hoped to enter the mine on or before the middle of the current week; to my knowledge, MSHA has not scheduled another meeting with the families to discuss the entry into the mine.

17. MSHA notified the public and the press that its investigation activities were expanding (with a supplemental team and an internal investigation of MSHA's actions releated to UBB prior to the explosion) and that MSHA's actions related to the UBB explosion would not be investigated by the accident investigation team prior to notifying the families of such news at the April 5th MSHA meeting.

18. MSHA has not kept its promises to the families, has not followed the laudable stated positions of Director Main and Secretary Solis in its actions, nor agreed to involve the families in a meaningful way in the investigation of the UBB tragedy that killed the families miners.

19. At the April 5 MSHA meeting, Director Main acknowledged that he anticipated that even if MSHA excluded the mine operator and the miners representatives from the interview process, witnesses would have the right to have a representative with them during their interviews. He also acknowledged that in most instances he anticipated that such witness representatives would be attorneys who will be being compensated for their appearance at witness interviews by the mine operator or one of its affiliated corporate entities.

20. The outcome of the circumstance addressed and acknowledged by MSHA in 19 above is that the interview process will occur without the presence of miners representatives or family representatives, but with the presence of counsel being compensated by the mine operator.

21. While MSHA has indicated that it intends to subject such mine operator compensated attorneys to a "strict ethical test," there exists no mechanism to prevent those attorneys from conveying non-attorney/client priviledged information to the mine operator, allowing the operator to have information regarding the investigation and the path of the investigation.

22. As a result of the circumstances set forth in 19 through 21 above, the investigations interview process will occur with the government and the mine operator being aware of the conduct of the investigation and its path while the

representatives of the miners and the families will be excluded from such knowledge until the investigation is completed.

23. Such outcome is repugnant to the law, the regulations, and the policy of MSHA and the Department of Labor and would occur if the announced MSHA investigation procedures are upheld. Such investigation procedures reflect an abuse of the agency's discretion.

AND FURTHER THE AFFIANT SAYETH NOT:

_____
Mark D. Moreland, Esq.

STATE OF WEST VIRGINIA;
COUNTY OF GREENBRIER, to wit:

Taken, subscribed and sworn to before me this 13th day of May, 2010, as witness my hand and official notarial seal.

My commission expires: July 18, 2011

_____
NOTARY PUBLIC



OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
JULIE GROSS
MARK D. MORELAND, L.C.
815 QUARRIER ST., STE. 306
CHARLESTON, WV 25301
My commission expires July 18, 2011